T.C. Memo. 2011-291

UNITED STATES TAX COURT

ERIK MCBRIDE THOMPSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 2718-09, 2720-09.　　　Filed December 19, 2011.

Erik McBride Thompson, pro se.

<u>Blaine C. Holiday</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:　Erik Thompson didn't file returns for tax years 2004 and 2006 because he disapproved of the wars in Iraq and Afghanistan and didn't want to fuel "the government's killing machine."　The Commissioner sent him a notice of deficiency, and Thompson filed a petition.　He didn't approach pretrial preparation in the spirit of cooperation that our Rules hope to

inspire, because he saw "little distinction between the activities of the IRS and Tax Court and the activities of those good law-abiding Germans who drove the trains to the death camps."

He began to back off from such sentiments at trial and brought with him numerous documents that he'd never shared with the Commissioner. We reserved decision on the Commissioner's motion to exclude this evidence, and Thompson eventually collaborated with the Commissioner to settle many issues. Two remain for both years in issue: (1) investment-interest expense and (2) rental-real-estate loss. The Commissioner says Thompson didn't substantiate the former and didn't participate actively enough in the rental real-estate activity to get the latter.

### Background

As a young man, Thompson left rural Milan, Minnesota, to go to Stanford, where he earned three degrees. He also served in the Peace Corps in Truk (or, as it is now known, Chuuk), Micronesia. And after his father died, he decided to return home to try to revitalize Milan.

He put his Stanford MBA to use by running the local bank, Prairie Sun Bank--where he eventually became chairman--and became part owner of Milan Agency, Inc., Prairie Sun Bank's holding company. He also founded Prairie Land & Lumber (Prairie), a

real-estate company, where he is still president and director.[1] This helped Thompson bring a slice of Micronesia home--Prairie owned ten rental properties that housed 100 Micronesians, a substantial portion of Milan's 300 or so residents.

The immigrants found work in nearby meat-processing facilities, and business soon ticked up at the local gas station and grocery store. Thompson himself also did fairly well but decided to protest his disagreement with the federal government by not filing his tax returns.

This did not, of course, stop third parties from sending information to the IRS. The Commissioner used that information to prepare "substitutes for returns" (SFRs)[2] that determined Thompson had $460,000 in income for 2004 and over $300,000 for 2006. Not knowing anything about Thompson's personal affairs, the Commissioner assumed Thompson was single and was entitled to only the standard deduction. The result was deficiencies that

---

[1] Prairie is an S corporation. If a business meets the requirements of section 1361, it may elect to become an "S corporation" and pay no corporate tax. An S corporation's income and losses, like a partnership's, flow through to its shareholders, who then pay income tax.

Unless otherwise noted, all section references are to the Internal Revenue Code for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Section 6020(b) authorizes the Commissioner to prepare a return when a taxpayer doesn't.

were quite large,[3] and the Commissioner also determined additions to tax for Thompson's failure to timely file, failure to timely pay, and failure to make sufficient estimated tax payments.

The Commissioner sent Thompson notices of deficiency with the SFRs attached.  Thompson filed petitions with this Court. We issued our standing pretrial orders in January 2010 setting the case for trial at our June 2010 trial session in St. Paul. (Thompson was and remains a resident of South Dakota.)  In April the Commissioner sent out a Branerton letter.[4]  Within a few weeks, Thompson provided some information--just not the type that the Commissioner was hoping for:  "You may be curious about my decision not to file * * * my actions are designed to call us back to the rule of law and stop the slaughter of innocents." The letter goes on at some length but leaves no doubt that Thompson intended to resist paying taxes because he disapproved

---

[3] Thompson didn't bother to file in 2005.  But he did make estimated tax payments in 2006 that were credited toward his 2005 tax liability.

[4] Branerton letters are the most common way for informal discovery to begin.  In Branerton Corp. v. Commissioner, 61 T.C. 691, 692 (1974), we explained:

> The discovery procedures should be used only after the parties have made reasonable informal efforts to obtain needed information voluntarily. * * * Essential to * * * [the stipulation] process is the voluntary exchange of necessary facts, documents, and other data between the parties as an aid to the more expeditious trial of cases as well as for settlement purposes. * * *

of the wars in Iraq and Afghanistan.  He claimed to believe that paying his taxes would violate the Nuremberg Principles.[5]

In keeping with our customary practice, we ordered the parties to exchange unstipulated documents no later than 14 days before trial.  Thompson still wouldn't budge.[6]  The pretrial order made clear that noncompliance, at least without good cause or both parties' consent, could lead to the exclusion of evidence.

The looming trial deadline finally spurred Thompson to get some information to the Commissioner.  The week before trial Thompson faxed his unfiled 2004 tax return, a copy of his filed 2003 tax return, and public-record data of a condo he owned in Hawaii.  These became stipulated exhibits.  But when we called the case for trial, Thompson still banked on a continuance.  As

---

[5] Thompson refers here to the principles established at the Nuremberg trials, which the United Nations affirmed and codified after World War II.  See Affirmation of the Principles of International Law Recognized by the Charter of the Nürnberg Tribunal, G.A. Res. 95(I), U.N. Doc. A/236 (Dec. 11, 1946); Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal, U.N. Doc. A/CN.4/SER.A/1950/Add. 1 (1950) (Nuremberg Principles).  The Nuremberg Principles provided that compliance with the law would be no excuse for those tried if the conduct would be complicit in, for example, a crime against humanity.  United States v. Malinowski, 472 F.2d 850, 856 n.7 (3d Cir. 1973).

[6] Thompson claimed that he sometimes suffered from long delays in receiving mail; but even if we take at face value his claim that he didn't get our order until April 20, that still gave him time to get at least some documents to the Commissioner before June.

the Commissioner reminded us, however, Thompson had spent almost a year with the Appeals officer doing nothing.  We therefore denied his request.

This finally jolted Thompson into action.  He introduced twelve exhibits into evidence, and he testified about investment-interest expense and Prairie's losses.[7]  Not only did he claim he had paid investment interest in 2004 and 2006, he also claimed he had investment interest that he had carried over from previous years.  The carryover would be a boon for 2006--an interest deduction as large as Thompson claimed would fully offset his $113,226 dividend from Milan Agency, Inc.

The Commissioner moved to exclude Thompson's exhibits, and rather than grant the motion, we reserved decision in one last attempt to get Thompson to give documents verifying his expenses to the Commissioner.  The Commissioner was to file an opening brief by September 9, 2010--Thompson had until then.  If he refused, we made clear, his window of opportunity to produce documents would close.

---

[7] When a taxpayer borrows money to buy into a partnership that actively conducts a trade or business, but in which the taxpayer himself doesn't materially participate, interest he pays on the loan is "investment interest."  The term also includes the interest someone pays on a loan whose proceeds he uses to buy an asset that yields "portfolio income."  See sec. 163(d)(3)(A), (5)(A).  "Portfolio income" includes most types of passive income, such as interest and dividends.

On August 4, 2010, the Commissioner reported that Thompson's communication was minimal.  To his credit, Thompson then did turn over some documents that enabled the Commissioner to verify gambling losses, mortgage interest, taxes paid, charitable gifts, and a capital-loss carryover.  We are left with only Thompson's investment-interest expense and his share of Prairie's losses to discuss.

## Discussion

We do not accept Thompson's claims that the Nuremberg Principles allow him to not file his returns.  See, e.g., Muste v. Commissioner, 35 T.C. 913, 920 (1961); Harper v. Commissioner, T.C. Memo. 1973-214, affd. without published opinion 505 F.2d 730 (3d Cir. 1974).  We might sustain his claimed expenses, though if the Commissioner has his way we will have virtually nothing in the record to support them.

## I.   Admissibility of Documents

The Commissioner moved to exclude the exhibits that Thompson presented for the first time at trial, and he renews his motion on brief.  He is surely correct that Thompson was dilatory in producing documents.  We may exclude, and often do exclude, evidence that a party tries to get admitted contrary to our pretrial order.  See Schaefer v. Commissioner, T.C. Memo. 1998-163, affd. without published opinion 188 F.3d 514 (9th Cir. 1999).  Thompson relies on one of the exceptions to our general

rule of exclusion, the exception for "good cause"--though the good cause that he claims is that he was out of town and didn't check his mail until seven weeks before trial. This is a poor excuse, especially considering his earlier uncooperative behavior and bellicose letters. But we acknowledge his attempts to provide some documentation after trial. The pretrial order does not mandate exclusion, and we will admit the documents. See Major v. Commissioner, T.C. Memo. 2005-141, affd. 224 Fed. Appx. 686 (9th Cir. 2007).[8]

---

[8] The pretrial order says, "The Court *may* refuse to receive in evidence any document or material not so stipulated or exchanged [that is, within the prescribed period], unless otherwise agreed by the parties or allowed by the Court for good cause shown." (Emphasis added.)

The Commissioner fears we are rewarding bad behavior. That is not our intent. We take into account that the documents' purpose was to substantiate the disputed expenses, which we find does not prejudice the Commissioner. Cf. Cagle v. Commissioner, T.C. Memo. 1993-217. We also recognize that Thompson is going at this *pro se* and for the first time. He would be unlikely to get such indulgence in the future, and we have other ways of discouraging delay. See sec. 6673.

The Commissioner also renews his objections based on lack of foundation and hearsay. All the documents presented dealt with Thompson's condominium in Hawaii, his claimed capital-loss carryover, a loan he had taken out, or deductions relating to Prairie that Thompson claimed. Thompson provided ample testimony of these topics and so the documents don't lack foundational evidence. We do, however, sustain the Commissioner's hearsay objection as to the handwritten notes on the face of Exhibits 12, 18, 21, 22, and 23 as well as the computations printed on the last page of Exhibit 22.

II.  Deductions and Losses

A.    Investment-Interest Expense

| Year | Claimed by Thompson | Allowed by the Commissioner | Amount in Dispute |
|------|---------------------|----------------------------|-------------------|
| 2004 | $11,374 | $8,868 | $2,506 |
| 2006 | 116,384 | 36,094 | 80,290 |

Thompson has the burden of proving losses and other deductions.  See Rule 142(a); Jordan v. Commissioner, T.C. Memo. 2009-223.  He called only himself as a witness during trial and testified generally that he incurred the investment-interest expense in dispute.  Of course, unsubstantiated testimony usually does not get a taxpayer very far.  See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  What Thompson really needs are records sufficient to verify his claims.  See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Thompson argues that his 2003 tax return shows $170,494 of investment-interest expense which he could carry forward to future years.[9]  He contends that the Commissioner's admission that he paid some investment-interest expense in 2004 and 2006 means that we should accept his own assertion about the specific amount of that interest, including the amount that he reported on his 2003 return, to allow the rest.  Tax returns, however, don't

_____

[9] Each year Thompson was limited in how much of the expense he could claim.  That's because the expense can offset only net investment income.  Sec. 163(d)(1).

substantiate deductions or losses; they are nothing more than a statement of a taxpayer's claims. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). Thompson therefore can't rely solely on his old return or his current say-so to prove the disputed amount. See McWilliams v. Commissioner, T.C. Memo. 1995-454 ("[t]axpayers cannot merely rely on prior years' tax returns in which credits were claimed"); see also Se. Mail Transp., Inc. v. Commissioner, T.C. Memo. 1992-252.[10] Thompson alludes in his brief to additional documentation, but it's not in the record. See Kanofsky v. Commissioner, T.C. Memo. 2006-79, affd. 271 Fed. Appx. 146 (3d Cir. 2008).

Although we thus have no information about interest paid before 2003, Thompson did provide some records of two United Bankers' notes for the years at issue. He borrowed over $500,000 on December 31, 2002, agreeing to pay a variable interest rate on a quarterly schedule. He then took out another loan in 2006, and used most of those proceeds to pay off the original 2002 loan. Thompson also gave us what appear to be 2006 quarterly statements and a renewal notice. Two of the quarterly statements related to the 2002 loan. They say he owed $4,391.22 in interest on March 31, 2006 (the renewal notice suggests he had to actually pay $4,399.13) and $7,500 in interest on June 30, 2006. Another

---

[10] Even if he had substantiated investment-interest expense from years before 2004, he'd have to show they were not absorbed in intervening years. McWilliams, T.C. Memo. 1995-454.

statement lists interest of $4,326.40 on the 2006 loan due at the end of 2006.  Finally, he gave us a bank slip noting an interest payment of $4,422.41 on the date he took out the 2006 loan.

The 2006 documentation convinces us that the 2002 note was still outstanding in 2004.  We have, however, little proof of the timing or amount of interest actually paid in 2002.  Thompson did document $20,648[11] in interest for 2006, and would like to estimate what he couldn't provide.  But without information about how he actually used the loan proceeds, we cannot say such payments were investment interest.  See Kudo v. Commissioner, T.C. Memo. 1998-404, affd. 11 Fed. Appx. 864 (9th Cir. 2001).[12] Thompson checked "Business Purposes" when he applied for the new loan.  He now claims that Prairie Sun Bank used the loan to invest in ECONAR Energy Systems Corp.[13]  These claims, however, are unsupported.  Even if he paid all of the interest he claimed, Thompson didn't demonstrate the amount of his investment in

---

[11] $4,399.13 + $7,500 + $4,326.40 + $4,422.41.  Several documents not only showed the amount due, but also indicated Thompson was not behind on his payments, satisfying us that he paid these amounts.

[12] The purpose is crucial because it determines whether the interest paid is deductible.  When we know a taxpayer paid a *deductible* expense, we sometimes can estimate the *amount*.  See Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930).  The converse does not hold true--knowing the amount (without more) does not let us estimate that an item is deductible.

[13] At trial he mentioned a heat pump manufacturer.  Maybe this is ECONAR, maybe not:  Thompson didn't say.

ECONAR nor why such investment triggered deductions under section 163(d). We thus sustain the Commissioner's limitation on Thompson's deduction of investment interest.

B. Nonpassive Losses

| Year | Claimed by Thompson | Allowed by the Commissioner | Amount in Dispute |
|------|---------------------|-----------------------------|-------------------|
| 2004 | $36,247 | -0- | $36,247 |
| 2006 | 34,607 | -0- | 34,607 |

The Commissioner argues that "petitioner was not able to establish that the rental activity was non-passive or that the activity was engaged in for a profit."[14] Showing unusual *chutzpah*, Thompson blames the Commissioner for waiting too long to raise the issue of *character* of the losses. (At trial Thompson focused on the amount of the loss.)

It's true that if an issue is untimely raised--unfairly surprising the opposing party by not giving him a chance to adequately address it at trial--we'll refuse to consider it.

---

[14] A passive activity is a trade or business in which the taxpayer doesn't materially participate. Sec. 469(c). Why the distinction? Congress is concerned that a taxpayer with income, such as wages, will look for an investment to generate noncash losses that will shelter that income. See Mowafi v. Commissioner, T.C. Memo. 2001-111.

Thompson described Prairie as having "10 rental homes," and the parties refer to Prairie's losses as "rental losses." Rental activities are passive unless a taxpayer meets certain requirements (such as spending more than 750 hours on the activity during the tax year). Sec. 469(c)(2), (7). Thompson has not shown that he met any of these requirements.

Rolfs v. Commissioner, 135 T.C. 471, 484 (2010) (citing prior caselaw).  But we disagree with Thompson's premise.  The Commissioner didn't raise this issue for the first time on brief; he raised it at trial.  (And considering Thompson hadn't bothered giving the Commissioner anything relating to his deductions and losses until one week before trial, this was no small feat.)  The Commissioner pointed out to the Court that something wasn't quite right with the Prairie losses on Thompson's 2004 return: Thompson somehow had both passive *and* nonpassive losses from Prairie and the Commissioner wanted to know how.  The Court tried to have Thompson clarify matters, but he was clearly confused: "How is one passive, one nonpassive?"  Unable to answer the Commissioner's argument, Thompson turned from testifying about the character of the losses to testifying about their amounts. His confusion--likely avoidable if he had complied with Court deadlines--is no excuse for failure to meet his burden.[15]

---

[15] Thompson also makes "fairness" arguments concerning the Prairie losses.  First he argues that because he believes Milan Agency, Inc., and Prairie are grouped together under banking law, they should be grouped together for tax law (and thus, we suppose, gains and losses of the two should be netted).  But grouping for tax law--at least for the purpose of applying the passive-activity loss rules--is defined under section 1.469-4, Income Tax Regs., which doesn't cross-reference banking law. Based on the little evidence Thompson did give us, we find he didn't meet that section's facts-and-circumstances test.  Sec. 1.469-4(c)(2) and (d)(1)(ii), Example (2), Income Tax Regs.  (Nor did he show he's not otherwise limited under paragraph (d) of that regulation.)

(continued...)

III. <u>Additions to Tax</u>

The final issues are additions to tax under section 6651 and 6654. Since Thompson conceded the additions to tax for 2004 on brief, we need only discuss 2006.

The Commissioner has the burden of production on additions and penalties, see sec. 7491(c), but the burden of persuasion remains on Thompson, see, e.g., <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-47 (2001). The first of the three additions to tax here is the addition for failure to timely file a tax return. See sec. 6651(a)(1). The Commissioner met his burden of production on this one because Thompson stipulated that he did not file his 2006 return.

The Commissioner has also met his burden for the second addition to tax--the one imposed on those who fail to timely pay taxes shown on a return. See sec. 6651(a)(2). Thompson didn't file a return, but section 6020(b) allows the Commissioner to prepare a substitute for return. An SFR that meets certain requirements is treated as "the return filed by the taxpayer for purposes of determining the amount of the addition." <u>Wheeler v.</u>

---

[15](...continued)
He also suggests that because he believes, citing <u>Vainisi v. Commissioner</u>, 599 F.3d 567 (7th Cir. 2010), revg. 132 T.C. 1 (2009), that the law concerning S corporations is uncertain, the Commissioner can't simply state his income is passive. Not so. The burden is on Thompson to show his activities were not passive, and this requirement applies even to shareholders of an S corporation. See <u>Harnett v. Commissioner</u>, T.C. Memo. 2011-191.

Commissioner, 127 T.C. 200, 208-09 (2006) (citing section 6651(g)(2)), affd. 521 F.3d 1289 (10th Cir. 2008). A valid SFR must provide more than background information about the taxpayer. See id. at 209. By incorporating tax information from third parties to make appropriate adjustments to tax, the Commissioner did just that.

Finally section 6654 imposes an addition to tax when a taxpayer fails to make estimated tax payments during the year. Sec. 6654(a) and (b). Thompson didn't file his 2005 return, so the required annual payment is 90 percent of the 2006 tax due. See sec. 6654(d)(1)(B). To meet his burden of production, the Commissioner must prove Thompson owed tax for 2006 and that Thompson paid insufficient estimated tax. We've determined that Thompson owes tax for 2006, and Thompson admits that he hasn't paid any tax besides the relatively small amount that was withheld. (Nor has Thompson shown that one of the section 6654(e) exceptions applies.)

Thompson instead asks us to give him a pass on account of his good faith--his willingness to show up for trial, the presentation of his 2003 return, and the Commissioner's recognition that some of the investment-interest expenses were legitimate.

There is, however, no reasonable-cause exception to the section 6654 addition that applies to Thompson. See Dodge v.

Commissioner, 96 T.C. 172, 183 (1991), affd. on this issue 981 F.2d 350 (8th Cir. 1992). There is such an exception to the other additions, see sec. 6651(a)(1) and (2), but Thompson failed to adequately explain either at trial or afterward why he didn't file his 2006 return or pay the amount that would have been shown on the return had he filed it. His Nuremberg Principles defense is not reasonable.

A final word of caution. Thompson seems to welcome future opportunities to come to the Tax Court.[16] We can help *pro se* litigants with legitimate claims, but not those who make frivolous arguments. Perhaps Thompson believes conflating the two is worth the risk; he is now cautioned that section 6673 allows the Court to impose sanctions of up to $25,000 on taxpayers making frivolous arguments.

Decisions will be entered

under Rule 155.

---

[16] "Petitioner is on a fact-finding journey through the Tax Court and any encouragement of delay, hindrance, or cost-increasing would be directed at <u>future</u> proceedings. Petitioner does not 'disregard * * * the rules of this court,' but rather hopes to learn them and possibly use them in the future." Answering Brief for Petitioner at 9-10.